1

2

3

4                      UNITED STATES DISTRICT COURT

5                          DISTRICT OF NEVADA

6                                 * * *

7    CENTER FOR BIOLOGICAL DIVERSITY,          Case No. 2:13-cv-01785-RFB-GWH
     *et al.*,
8
                          Plaintiffs,                      **ORDER**
9
            v.
10
     TOM VILSACK, *et al*.,
11
                          Defendants.
12

13

14          **I.      INTRODUCTION**

15          This case centers on a biological-control program initiated by the United States Department

16   of Agriculture (USDA) through two of its agencies: Agricultural Research Services (ARS) and

17   Animal and Plant Health Inspection Services (APHIS). Plaintiffs Center for Biological Diversity,

18   Maricopa Audubon Society, and Dr. Robin Silver (the "Center") allege that the USDA violated

19   the Endangered Species Act (ESA) by failing to ensure that the program's termination would not

20   jeopardize a bird called the southwestern willow flycatcher ("flycatcher") and by failing to take

21   appropriate action to mitigate the adverse effects resulting from the program's termination. The

22   Center also alleges that the USDA and the United States Department of the Interior (USDI)

23   violated the National Environmental Policy Act (NEPA) by failing to pursue formal consultation

24   before terminating the program, by failing to implement mitigation measures outlined in a NEPA

25   document after terminating the program, and by failing to supplement the USDA's original NEPA

26   documents.

27          The parties filed motions for summary judgment, ECF No. 28 and ECF No. 30. For the

28   reasons discussed below, the Court denies the Center's motion and grants the USDA's motion as

1  to Claims 1, 3, 4, and 5. As to Claim 2, the Court grants the Center's motion and denies the USDA's

2  motion.

4  **II.    BACKGROUND**

5      **A.  Factual Background**

6      Plaintiffs contend that the Defendants violated the ESA and NEPA when, in 2010, the

7  USDA, through APHIS, terminated a certain beetle release program without taking further action.

8  <u>See</u> Pl.'s MSJ at viii. The facts relevant to this case occurred during three periods: (1) USDA's

9  initial research and its 1999 program; (2) USDA's 2005 program; and (3) USDA's decision to

10  terminate the 2005 program in 2010. Before describing the facts pertaining to these three periods,

11  the Court provides an overview of the USDA's processes leading to the termination of the overall

12  program in 2010.

13      **1.  Overview of USDA Process Under The ESA and NEPA**

14      Under the Endangered Species Act (ESA), federal agencies are required, to: 1) "utilize

15  their authorities . . . by carrying out programs for the conservation of endangered species" in

16  consultation with the Secretary of the Interior. 16 U.S.C. § 1536(a)(1); and 2) in "consultation"

17  with the Fish and Wildlife Services (FWS), to "insure that any action authorized, funded, or carried

18  out by such agency . . . is not likely to jeopardize the continued existence of any endangered

19  species" or to "result in the destruction or adverse modification of habitat of such species" that has

20  been designated as "critical." 16 U.S.C. § 1536(a)(2).

21      The ESA and its regulations impose certain procedural duties on various federal agencies

22  and the FWS. If an agency determines in a biological assessment ("BA") that its action may affect

23  a listed species or critical habitat, the action agency must engage in formal consultation with the

24  FWS, unless the agency finds, and the FWS concurs, that the action is "not likely to adversely

25  affect" in any fashion the species or its critical habitat. 50 C.F.R. § 402.14(a), (b).

26      When formal consultation is required, the process culminates in preparation of a biological

27  opinion ("BiOp") by the Service, which must be based on the "best scientific and commercial data

28  available," 16 U.S.C. § 1536(a)(2), setting forth "how the agency action affects the species or its

critical habitat." Id. § 1536(b)(3). The BiOp must address whether the action, along with "cumulative effects" as defined by the Service, see 50 C.F.R. § 402.02, will jeopardize the species' existence or adversely modify critical habitat and, if so, the Service must set forth any "reasonable and prudent alternatives" that would not violate the statutory prohibitions. 16 U.S.C. § 1536(b)(3)(A).

Regarding NEPA, this act imposes only procedural requirements rather than particular substantive results. Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 523 (9th Cir. 1994). It requires federal agencies take a "hard look" at the environmental consequences of its proposed major actions. Ocean Advocates v. U.S. Army Corps of Eng'rs, 361 F.3d 1108, 1124 (9th Cir. 2004). NEPA also requires agencies complete an Environmental Impact Statement ("EIS") for any major federal action that may significantly affect the quality of the human environment. 42 U.S.C. § 433(2)(C). However, an agency may prepare an Environmental Assessment ("EA") to determine if its proposed action might significantly affect the quality of the human environment before preparing an EIS. 40 C.F.R. § 1508.9. An EIS is not required if the agency issues a Finding of No Significant Impact ("FONSI") in its EA. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 752 (2004).

## 2. Initial Research and 1999 Program

In 1986, the USDA began researching biological-control methods for the saltcedar—a tree nonnative to the United States that threatens the population and diversity of indigenous plants. AR A6666 and A3414. Through its research, the USDA identified the *Diorhabda elongate* (the "beetle") as one such method. AR A6666. *Diorhabda elongate* is a leaf-eating beetle that acts as a host-specific insect. Id. The USDA realized the beetle could be used to control the saltcedar population through repeated leaf defoliation. AR A6666. Consequently, the USDA proposed to introduce the beetle in the United States in an effort to encourage native plant growth and to benefit other species within the ecosystem. Id. With support from multiple federal agencies, the USDA scheduled the initial beetle release for June 1995. Id.

However, the program was delayed in March 1995 after the U.S. Fish and Wildlife Service (FWS) listed the flycatcher as an endangered species and designated areas throughout the

southwestern United States as critical habitat. AR F988-97. The flycatcher often nests in saltcedar trees because human activities and invasive plants have reduced the flycatcher's native habitat. Id.

Because the FWS listed the flycatcher as an endangered species and the USDA's beetle program targeted a plant in which the flycatcher nests, the USDA was required to consult with the FWS before releasing any beetles. Thus, the USDA drafted a biological assessment in 1997 and submitted it to the FWS. AR A6666, A466, A451. The USDA also submitted a project proposal to the FWS based on the draft BA. AR A1276. The project proposal included the following conditions and revisions:

1.    The USDA would place beetle cage sites at least 200 miles from saltcedar populations that served as nesting sites for flycatchers. AR A1286, A1289.

2.    The USDA would remove the Arizona and southern Nevada locations from the program. AR A1275-76.

3.    The USDA would review research between Phase I (release of beetles into cage sites) and Phase II (general release). AR A1286. The review would determine whether remedial actions would be needed before Phase II began. Id.

4.    The USDA agreed to monitor the beetles in cages for one year before releasing the beetles into fields. AR A186-87. The USDA would continue to monitor the beetles for two to three years before the general release phase began. Id.

5.    The Saltcedar Consortium[1] would review the results, progress, and effects of the program and make recommendations for repression or implementation of manual vegetation if needed. AR A1292-93.

6.    The USDA would be the lead agency for natural revegetation, but land management agencies at the release sites would retain the responsibilities for manual revegetation. AR A1293-94.

---

[1] "A Saltcedar Consortium will assist the partners in defining the roles of various cooperators in this project. The consortium members include US Department of Agriculture Agricultural Research Service Animal Plant Health Inspection Service and Forest Service. Other US Department of Interior members including Bureau of Land Management Bureau of Reclamation Fish and Wildlife Service National Park Service." AR A1322.

In December 1998, the FWS issued a Letter of Concurrence with USDA's BA, concurring with USDA's finding that the proposed actions "may affect but were not likely to adversely affect the flycatcher or its critical habitat." AR A1373, A6666.

USDA then notified the public of its draft environmental assessment (EA) as required by NEPA. AR A1406-07. The draft EA discussed ARS's request for a permit for the beetle program and APHIS's Finding of No Significant Impact on the flycatcher or its habitat by the program. Id. After reviewing the amended EA, the FWS concurred with the FONSI in June 1999. AR A1543-44. Despite concerns about the beetles' rate of travel and the ability to survive below the 37N latitude, the FWS explained it concurred with the FONSI because of the conditions outlined in the project proposal. Id.

The USDA issued a final EA and FONSI for the program in July 1999. AR A1525-54. In the EA, the USDA agreed to adopt measures to mitigate the risk of beetles spreading rapidly, invading nesting areas of flycatchers, and killing saltcedar trees faster than native plants could regenerate. AR A1534.

Three months later, the Saltcedar Consortium developed a Memorandum of Understanding ("MOU").[2] AR A1737-45. The MOU defined the roles, responsibilities, and financial resources for the joint management of the program. Id. Specifically, the program participants agreed to:

1.   Monitor the biology, population, natural dispersal, damage, and control of the saltcedar and any non-target plant;

2.   Monitor the recovery of native plants; and

3.   Monitor the recovery of wildlife species during and after the program. AR A1737. The MOU attached a list of the program sites and the contact agency for each site. Id. at 1738-45. Land managers, in collaboration with the Saltcedar Consortium members, agreed to allow access and monitoring according to the monitoring plans. Id. at 1737. They also agreed the insects and monitoring equipment would not be redistributed without a USDA permit. Id.

---

[2] Representative from the FWS, U.S. Bureau of Reclamation, U.S. Bureau of Land Management, Geological Survey Biological Resource Division, National Park Service, USDA, U.S. Forest Service, Natural Resources Conservation Service, U.S. Department of Defense Corps of Engineers, and state departments formed the Saltcedar Consortium. AR A1293-94.

The USDA began issuing permits for the release of beetles into secure cages in July 1999. AR A1555-78. A year later, the USDA issued permits that authorized releasing the beetles from field cages to open fields. AR A1702-03. The USDA then released the beetles at the permitted sites. A2366-67.

According to monitoring reports, the beetles could not survive south of 37N latitude. AR A2368, A3732-47. The FWS concurred with most of the USDA's requests for additional sites in Texas, New Mexico, and elsewhere in 2003 and 2004 to determine if the beetles could survive and reproduce below 37N latitude. AR A2101-02, A2179-181, A2356-57, A2359, A2363-65, A2362, A2368, A2376-380.

### 3. The 2005 Release Program

In November 2003, USDA proposed a draft EA to initiate a second program to control the invasive saltcedar tree. A2966-67, A2975. The draft EA asserted that flycatchers were not known to nest in the proposed locations[3] and that the beetles could not survive below 37N latitude. AR A2975 and 2955.

The FWS responded to the draft EA and recommended the USDA meet with land managers in each state before any beetle releases occurred to develop management plans. AR A3070. The FWS suggested that the plans address any necessary control methods, funds needed for control, and funding mechanisms. Id. The FWS also expressed concern over the risk of the beetles spreading faster than hypothesized. AR A3073. It asked USDA to monitor the release sites with this risk in mind and to develop a contingency plan in case the risk was realized. AR A3073.

In March 2004, the USDA submitted a monitoring plan in response to the FWS's request. AR A3113-28. In the plan, the USDA outlined the conditions of the second release program and agreed to develop and implement a restoration and mitigation plan by meeting with land managers if monitoring showed the steps were warranted. AR A3114, A3120. The plan assigned data management responsibilities, including post-release monitoring, to USDA personnel or local

---

[3] The proposed locations listed in the draft EA included: Colorado, North Dakota, South Dakota, Iowa, Nebraska, Nevada, Kansas, Missouri, Montana, Idaho, Oregon, Washington, Utah, and Wyoming. AR A2795.

collaborators. AR A3120.

In March 2005, the USDA transmitted a final BA to the FWS for the 2005 program. AR A3407-97. It proposed to establish beetle release sites north of 37N latitude, an area where the flycatcher was not known to nest. AR A3487, A6895, A7289. The USDA concluded the 2005 program was not likely to adversely affect the flycatcher or its habitat. AR A3488. In doing so, the USDA relied on the assumptions found in the 2003 draft EA—namely, that the "[t]he northern limit of the flycatcher's range is about 37N latitude." AR A3487. The USDA used the current science at the time, which failed to differentiate between two beetle strains. AR A3422, A3921. Namely, a strain of beetle originating from Crete, rather than Asia, were tested and revealed to be more adaptable to environmental conditions below 37N latitude. AR A3422. The USDA also excluded Utah from its list of proposed release sites due to an earlier event that resulted in beetle release in Saint George, after a USDA employee gave a presentation on the benefits of using the beetles for saltcedar control. AR A3423, AR A3922. It is disputed whether the employee provided information on how to circumvent federal guidelines and encouraged the locale to distribute beetles or if the employee provided standard information on federal guidelines when explaining why he could not help fund or assist with obtaining the beetles. ECF No. 28 at 16; ECF No. 31 at 16-17.

In June 2005, the USDA submitted a final EA concerning general release of the beetles and issued a FONSI. AR A3914-72, A3912-13. The USDA recognized the importance of the saltcedar to the flycatcher but still found the proposed beetle release program would not result in a significant impact. AR A3946. The USDA relied on the assumptions that the beetles could not survive lower than 37N latitude and that the beetles would spread slowly. Id.

In July 2005, the FWS concurred with the USDA's BA and determined that formal consultation was unnecessary. AR A3994-98, A3436, A3488. The FWS based its concurrence on the assumptions from the 2003 draft EA. Id.

The FWS clarified that the USDA would develop revegetation and mitigation plans at the USDA insectary sites, but that landowners and managers were solely responsible for addressing unanticipated impacts. AR A3995. The FWS also stated that it assumed the USDA's agency,

APHIS, had no discretion or control over potential post-release indirect effects otherwise. Id.

The USDA approved the release of the beetles at selected field insectary sites in thirteen states and the initial releases were made in August 2005. AR A4076, A6058. In the following years, the USDA established forty-eight insectary sites. AR A5997. It considered adding Utah to its 2005 program but declined after preparing a BA and consulting with the FWS. AR A5997, AR A4884, AR A4992-98.

### 4. The 2010 Decision to Terminate the Program

In September 2008, the USDA learned that beetles had reached the flycatcher's critical habitat. AR A5624, A5061. It was determined the beetles originated from a site in Delta, Utah associated with a 1999 permit. AR A5061. Specifically, in September 2008, it was determined that Utah state and local government officials had removed beetles from the Delta site and released the beetles near Saint George, Utah to control saltcedar populations. AR A5627, A5061-62, A5365, A5065, A9588-89, A5522-23. The beetles spread as far south as Arizona because of the releases. AR A5061. The record does not indicate that any other site or any other USDA activities contributed to the beetles spreading south.

Five months later, the USDA attended a research conference and obtained information about the beetles that was not previously considered. AR A5624-28. Namely, at a 2009 research conference in Reno, Nevada, scientific data indicated that a beetle had adapted and successfully reproduced in areas as far south as the 32N latitude. Id. at 5628. Due to the beetles' presence in flycatcher habitat and the new information obtained at the conference, the USDA requested meetings and consultation with the FWS to discuss further ESA consultation. AR A5064.

A formal request followed three months later, in which USDA requested reinitiation of consultation and assistance in preparing a revised BA. AR A5628-29. The FWS and the USDA discussed the proper subject and scope of the consultation and determined that the reinitiated consultation regarded the 2005 program. AR A5577-83; F693-95.

The USDA completed a BA proposing termination of the program. AR A5986-6121. The BA outlined three paths of action that the USDA then pursued:

    1.    Terminating the 2005 beetle program. AR A6040. "Only monitoring of sites is

currently occurring." Id.

2.      Discontinuing the issuance of new permits for environmental release of the beetles and terminated existing permits. Id.

3.      Discouraging human-assisted movement of the beetles through an informational memorandum to other federal and state agencies and departments. Id.

Additionally, the USDA agreed to participate in an interagency group to address the needs of the flycatcher. Id.

While eradication efforts were addressed in the BA, the USDA ultimately stated eradication was impractical due to high costs, low probability of success, and likelihood of an adverse effect on other species. Id. The USDA also claimed eradication could not be undertaken unilaterally. Id. The USDA concluded the above actions may affect but were not likely to adversely affect the flycatcher or its critical habitat. Id.

The FWS concurred with the USDA's finding of unlikelihood of an adverse effect. A6207. The concurrence concluded informal consultation under Section 7 of the ESA. Id. The consultation's scope did not include any information regarding the 1999 permits. See Id.

**B. Procedural History**

The Center filed its Complaint in this action on September 30, 2013. ECF. No. 1. The Complaint names five officials as defendants: USDA Secretary Tom Vilsack; APHIS Administrator Gregory Parham; ARS Administrator Edward Knipling; USDI Secretary Sally Jewell; and FWS Director, Dan Ashe. Id. However, the parties stipulated to the voluntary dismissal of all claims against ARS Administrator Knipling and all claims against the ARS. ECF No. 13.

The Complaint alleges five causes of action: (1) the USDA violated Section 7(a)(2) of the ESA by terminating the program without insuring the termination would not cause jeopardy to the flycatcher; (2) the USDA violated Section 7(a)(1) of the ESA by failing to adopt a mitigation plan; (3) the USDA and the USDI violated ESA's formal consultation requirements; (4) the USDA violated NEPA by failing to implement mitigation measures; and (5) the USDA violated NEPA by failing to engage in supplemental NEPA review. ECF No. 1. The Center prayed for declaratory and injunctive relief and also a requested attorney fees and costs. Id.

The Center moved for summary judgment on all claims in December 2014. ECF No. 28. Two months later, the USDA and the USDI also moved for summary judgment. ECF No. 30. The Court held oral arguments regarding the parties' motions for summary judgment on February 1, 2016. ECF No. 52.

On March 31, 2016, the Court issued a minute order, granting in part and denying in part both motions for summary judgment, stating a written order would issue. ECF No. 54. This Order sets forth the Court's reasoning for its ruling. In the intervening period, the Court has held hearings to determine the scope of any injunctive or other relief.

## III.    LEGAL STANDARD

### A.  Summary Judgment Under Federal Rule of Civil Procedure 56(c)

The Federal Rules of Civil Procedure allow for summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (2000). In evaluating a motion for summary judgment, the Court must read the evidence and draw all inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). "A party seeking summary judgment always bears the initial responsibility of informing the district court on the basis of its motion." Celotex Corp., 477 U.S. at 323. If the moving party meets this initial burden, the burden shifts to the nonmoving party. Id. at 330.

### B.  Administrative Procedure Act

The Administrative Procedure Act (APA) governs the Court's review of ESA and NEPA claims. San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014). The Court will therefore uphold an agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

Under the APA's narrow review standard, the Court must not "substitute its judgment for

that of the agency." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983). Instead, the Court must determine whether the agency "has articulated a rational connection between the facts found and the conclusions made." <u>Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation</u>, 426 F.3d 1082, 1090 (9th Cir. 2005). If the agency "articulated a rational connection between the facts found and the conclusions made" or the "agency's path may reasonably be discerned," the Court will sustain the agency's decision. <u>Id.</u> Alternatively, the Court will overturn the agency's action if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc.</u>, 463 U.S. at 43.

Moreover, courts give deference to an agency's interpretation of a statute that it administers. <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 844 (1984). Courts also take into account the rule of harmless error. <u>Riverbend Farms, Inc. v. Madigan</u>, 958 F.2d 1479, 1487 (9th Cir. 1992).

Lastly, in order to be subject to judicial review under the APA, an agency action must be either reviewable by statute or considered a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

## IV.     DISCUSSION

The Court first considers Claims 1 and 3, which the Center brought under Section 7(a)(2) of the ESA. The Court then evaluates Claim 2, brought under Section 7(a)(1) of the ESA. Last, the Court considers Claims 4 and 5, which the Center brought under NEPA and related regulations.

After reviewing the competing motions and the supporting exhibits, the Court concludes that neither the USDA nor the USDI violated Section 7(a)(2) of the ESA. The Court also finds that USDA did not violate NEPA or the related guidelines. However, the Court finds the USDA failed

to take affirmative action to conserve the flycatcher as required by Section 7(a)(1) of the ESA.[4]

## A. Claims 1 and 3 brought under Section 7(a)(2) of the ESA

The Center alleged two claims, Claims 1 and 3, under Section 7(a)(2) of the ESA, which contains a "substantive" mandate to avoid jeopardizing listed species and their habitats, and a "procedural" obligation to consult meaningfully with the FWS to ensure the substantive mandate is fulfilled. Sierra Club v. Marsh, 816 F.2d 1376, 1384-88 (9th Cir. 1987).

Under Claim 1, Plaintiff argues that the USDA failed to ensure that the flycatcher would not be jeopardized when the USDA terminated the beetle program without taking any remedial steps. Under Claim 3, the Center contends the USDA violated the ESA Section 7(a)(2) when it reinitiated ESA consultation solely for its 2010 decision to terminate the 2005 program and associated permits rather than consulting on the full scope of the programs.

The Court considers each in turn.

### 1. The USDA Did Not Violate Section 7(a)(2) of the ESA by Terminating Its Program

Under Claim 1, Plaintiff alleges a substantive violation of Section 7(a)(2) and argues that the USDA failed to ensure that the flycatcher would not be jeopardized when the USDA terminated the beetle program without taking any remedial steps.

The USDA responds that the Center improperly conflated the actions of two USDA agencies—APHIS and ARS. Consequently, the Center expanded the actions under review and amplified the affect the program had on the flycatcher and its habitat.

As an initial matter, APHIS and ARS act as agencies of the USDA. 7 C.F.R. §§ 371.1, 500.1. The USDA created and delegated certain parts of its authority to these agencies. Id.; 7 C.F.R. § 7701. The delegation, however, does not divest the USDA of its powers. 7 C.F.R. § 2.12. Rather, the agencies are subject to the general supervision of the USDA. 7. C.F.R. § 2.7.

---

[4] While this Opinion references the "USDA" throughout, it should be understood that this applies to the USDA's actions through and by its APHIS. The Court's findings apply to that agency's action(s).

Accordingly, the Court considers the actions of APHIS and ARS as actions of the USDA.

### a. Legal Standard

Under Section 7(a)(2) of the ESA, federal agencies must ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize an endangered species or its critical habitat. 16 U.S.C. § 1536. An action jeopardizes an endangered species or its habitat if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of [an endangered species]." 50 C.F.R. § 402.02; see Pyramid Lake Oaiute Tribe of Indians v. U.S. Dept. of Navy, 898 F.2d 1410, 1415 (9th Cir. 1990).

The Supreme Court did not limit the reach of Section 7(a)(2) to federal actions relating to federal projects in the planning stage. Tennessee Valley Auth. v. Hill, 437 U.S. 153, 174 (1978). Section 7(a)(2) instead reaches any federal action relating to a federal project whether the project is completed or not. Id. Moreover, the implementing regulations for the ESA define "action" as "all activities or programs of any kind authorized, funded, or carried out ... by Federal agencies," including the granting of permits. 50 C.F.R. § 402.02; see Nat. Res. Def. Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998). The regulation lists as examples "actions intended to conserve listed species or their habitat" and "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. §§ 402.02(a), (d); Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv., 789 F.3d 1075, 1085 (9th Cir. 2015).

"An agency must consult under Section 7 only when it makes an 'affirmative' act or authorization." Pac. Rivers Council v. Thomas, 30 F.3d 1050, 1055 (9th Cir. 1994). "Where no federal authorization is required for private-party activities, an agency's informal proffer of advice to the private party is not 'agency action' requiring consultation." Karuk Tribe of California v. U.S. Forest Serv., 681 F.3d 1006, 1021 (9th Cir. 2012) (internal citations omitted). Moreover, "[t]he regulations promulgated pursuant to the ESA make it clear that the operation of a project pursuant to a permit is not a federal agency action." California Sportfishing Prot. All. v. F.E.R.C., 472 F.3d 593, 598-99 (9th Cir. 2006) (internal citations omitted) (holding the granting of a license is federal agency action, but the continued operation by a non-federal agency is not).

Additionally, Section 2(c) and Section 3(2) of the ESA direct agencies to "use … all

methods and procedures which are necessary" to preserve endangered species. 16 U.S.C. §§ 1531(c), 1532(3). A project jeopardizes the continued existence of a species when it is based on a legally flawed biological opinion (BiOp). <u>Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.</u>, 698 F.3d 1101, 1128 (9th Cir. 2012).

### b. Application

In this matter, the Center challenges the USDA's 2010 decision to terminate the program and associated permits. ECF No. 1 at 1-2. In Claim I, the Center argues that the ESA did not ensure against jeopardy as required by Section 7(a)(2) because it failed to take *additional* actions to mitigate possible harm to the flycatcher after terminating the program.

The Center relies on <u>Tennessee Valley Authority</u> and <u>Center for Biological Diversity</u>. Those cases are distinguishable. Unlike the federal agencies in <u>Tennessee Valley Authority</u> and <u>Center for Biological Diversity</u>, the USDA in this case is not seeking to *continue* a project in contradiction with the ESA's purpose. <u>Tennessee Valley Auth. v. Hill</u>, 437 U.S. 153, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978) (prohibiting completion of dam, where operation of dam would either eradicate known population of the snail darter, an endangered species, or destroy its critical habitat); 698 F.3d 1101, 1119 (9th Cir. 2012); <u>Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.</u>, 698 F.3d 1101 (9th Cir. 2012) (finding the BLM's authorization of a pipeline was arbitrary and capricious). In this case, Plaintiff does not challenge an ongoing or continuing action; the USDA has already terminated the beetle-release program in order to prevent potentially jeopardizing the flycatcher and its environment. Rather, Plaintiff challenges Defendants' actions as insufficient under the ESA. Therefore, Plaintiff's reliance on these cases is unpersuasive.

Moreover, the facts underlying the USDA's decision to terminate the release program undermine Plaintiff's claim. The USDA based its decision to terminate the release program on newly discovered information that the beetle could survive below 37N latitude and reach flycatcher habitat. By 2008, the USDA learned that the beetles had reached the flycatcher's critical habitat. AR A5624. It also learned that the beetles could survive below 37N latitude. <u>Id.</u> Additionally, the USDA obtained previously unknown information at the research conference. <u>Id.</u> Based on the new

information, the USDA and the FWS engaged in and completed consultation under the ESA. The consultation resulted in USDA's BA, which proposed to terminate the project. The FWS concurred with the BA, finding the termination would not likely have an adverse effect on the flycatcher or its habitat. Thus, the USDA made the same decision for itself that the court ordered the agency to take in <u>Tennessee Valley Authority</u>: termination of a program that jeopardized listed species and their habitats.

Additionally, unlike the federal agency in <u>Center for Biological Diversity</u>, the USDA acted on newly discovered information to terminate its program; it did not act on an allegedly invalid BiOp as a basis for continuing with a program. <u>Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.</u>, 698 F.3d 1101, 1106 (9th Cir. 2012) (finding that "(1) the Biological Opinion's 'no jeopardy' and 'no adverse modification' determinations relied on protective measures set forth in a conservation plan not enforceable under the ESA; (2) the Biological Opinion did not take into account the potential impacts of withdrawing 337.8 million gallons of groundwater from sixty-four wells along the pipeline"). In this case, Plaintiff does not challenge the BiOp or the underlying information the Defendants based their decisions on as arbitrary and capricious, but rather argues that the failure to adopt further mitigating factors in addition to discontinuing the release program was insufficient under the ESA. Therefore, <u>Center for Biological Diversity</u> is further distinguishable.

Moreover, the beetles found in flycatcher habitat originated from the Delta, Utah site as a result of state and local Utah entities' actions. AR A5627, A5061, A5365, A5065, A9588-89. The USDA did not authorize the state and local actions. <u>Id.</u> The Administrative Record shows no indication that the beetles came from any other site or as a result of federal action. Because the record traces the spread of the beetles back to the Delta site and to state and local entity action, the actions do not constitute federal action and thus do not fall within the purview of Section 7(a)(2). <u>See</u> AR A5627.

To the extent that the Center argues the granting of the Delta permit failed to ensure against jeopardy, the Court disagrees. When the USDA issued the permit to the Delta site, the USDA believed the beetles would not adversely affect the flycatcher or the flycatcher's habitat. See AR

A5626. The USDA's belief stemmed from exhaustive research beginning in 1986. See AR A5624-25. Once the USDA learned two strains of beetle existed—one of which could survive in the flycatcher's critical habitat—the USDA followed USDA protocols and terminated the program. AR A6040. Thus, the USDA acted in an effort to prevent any possible jeopardy originating from sites operated by a federal agency.

For the reasons stated, the Court therefore GRANTS Defendants summary judgment on Claim 1.

### 2. The USDA Did Not Violate Section 7(a)(2)

The Center asserts a second claim under Section 7(a)(2), which is that the USDA failed to comply with the section's procedural requirements. Specifically, Plaintiff contends the USDA violated Section 7(a)(2) when it reinitiated ESA consultation solely for its 2010 decision to terminate the 2005 program and associated permits, rather than consulting on the full scope of the programs. ECF No. 28 at 29-30. Consequently, the Center argues, the USDA improperly avoided formal consultation procedures. Id.

The USDA argues that the Center cannot group together all of the USDA's agencies' actions to broaden the consultation scope. ECF No. 30. It also argues that it properly limited the reinitiated consultation to the 2005 program and 2010 decision because the USDA did not retain any discretionary involvement or control over the 1999 permits.

### a. Legal Standard

"Procedurally, before initiating any action in an area that contains threatened or endangered species, federal agencies must consult with the FWS … to determine the likely effects of any proposed action on species and their critical habitat. The ESA and its implementing regulations establish a framework for such inter-agency consultation. The agency proposing the action …must independently determine whether the action 'may affect' a listed species or its habitat under the ESA. If the answer is yes, 'formal consultation' with the appropriate consulting agency is generally mandatory. An action agency may bypass formal consultation if it determines, and the consulting agency agrees, that the proposed action 'is not likely to adversely affect any listed species or critical habitat.' When that occurs, 'the consultation process is terminated, and no further action is

necessary.' If, however, after this 'informal consultation,' the consulting agency disagrees that the proposed action is not likely to have adverse effects, then formal consultation is required. In formal consultation, the consulting agency must prepare a biological opinion that advises the action agency as to whether the proposed action, alone or 'taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.'" Conservation Cong. v. U.S. Forest Serv., 720 F.3d 1048, 1051 (9th Cir. 2013) (internal citations omitted).

### b. Application

After reinitiating consultation, the FWS and the USDA determined the subject and scope of the consultation. AR A5577-83. Based upon the discussions, the USDA completed a BA and concluded that the 2005 program's termination and permits would not likely have an adverse effect on the flycatcher or its environment. AR A5986-6121, A6040. The BA included historical consultation for actions beginning in 1997 through the 2005 program. See AR A5986-6121. However, the BA only reviewed the USDA's 2010 decision to terminate the 2005 program and its related permits. AR A6040. The FWS concurred with the USDA's findings, which concluded the USDA's consultation obligations under Section 7 of the ESA. AR A6207.

The Center argues the scope of the informal consultation should have led to formal consultation and included review of all of the impacts from all of the USDA's actions pursuant to 50 C.F.R § 402.16. However, 50 C.F.R § 402.16 did not require formal consultation as suggested by the Center. The regulation requires formal consultation be reinitiated when new information comes to light that affects the decision made in the original formal consultation. Formal consultation was not pursued during the original program. Accordingly, 50 C.F.R. § 402.16 does not apply and does not mandate formal consultation.

Rather, 50 C.F.R. § 402.12(f) governs the contents of the BA, which gives the federal agency discretion in determining the document's contents. See Conservation Cong. v. U.S. Forest Serv., 720 F.3d 1048, 1056 (9th Cir. 2013) ("The contents of a biological assessment are at the '*discretion*' of the federal agency, 'depend on the nature of the Federal action,' and '*may*' include on-site inspections of the affected area, experts' views, literature reviews, and analysis of alternate

actions, as well as 'consideration of cumulative effects, and the results of any related studies.' 50 C.F.R. § 402.12(f)") (emphasis in the original). Here, when the BA concluded that terminating the program would not likely have an adverse effect on the flycatcher and the FWS concurred, the USDA's Section 7 consultation requirements were fulfilled.

The Center relies on <u>Wild Fish Conservancy v. Salazar</u>, 628 F.3d 513 (9th Cir. 2010), to argue the scope of the BA should have included all of the USDA's actions and the resulting impacts. <u>Wild Fish Conservancy</u> is dissimilar to the facts in this case. The court in <u>Wild Fish Conservancy</u> held a long-term project could not be delineated into smaller projects to avoid determining the cumulative effect in a BiOp. <u>Id.</u> at 525. Here, the USDA did not delineate its project to avoid showing future impacts in a BiOp. Rather, it terminated its project to avoid any future impacts. This case is therefore inapposite and does not support the Plaintiff's position.

For the reasons stated, the Court therefore GRANTS Defendants summary judgment on Claim 3.

### 3. USDA Did Violate Section 7(a)(1) of the ESA.

The Center brings its second claim under Section 7(a)(1) of the ESA. The Center argues that the USDA violated Section 7(a)(1) by failing to adopt "any conservation program" designed to conserve the flycatcher. ECF No. 28. The USDA responds that it satisfied the ESA in two ways. ECF No. 30. First, it designed and adopted the beetle program, in part, to conserve habitats that endangered species like the flycatcher rely upon. <u>Id.</u> Second, it applied a long-standing policy to discontinue and terminate permits adversely effecting endangered species. <u>Id.</u>

### a. Legal Standard

When enacting the ESA, Congress intended to halt and reverse the trend toward species extinction at all costs. <u>Tennessee Valley Authority</u>, 437 U.S. at 184. Section 7(a)(1) of the ESA requires federal agencies consult with the FWS and act with its assistance to carry out conservation programs for endangered species. 16 U.S.C. § 1536(a)(1). "Conservation" means to use all necessary methods and procedures to bring any endangered species to the point at which conservation efforts are no longer necessary. 16 U.S.C. § 1532.

Accordingly, the ESA creates an affirmative duty: it requires federal agencies take proper

steps to conserve endangered species. <u>Tennesse Valley Authority</u>, 437 U.S. at 183. The ESA does not mandate specific duties. <u>Pyramid Lake Paiute Tribe of Indians</u>, 898 F.2d at 1410. Moreover, courts defer to an agency's determinations on how to fulfill its duties. <u>Id.</u> But taking insignificant measures cannot satisfy the requirements under Section 7(a)(1). <u>See id.</u> at 1416-19.

### b. Application

Because the Center challenged the 2010 decision to *terminate* the program, the Court determines whether the USDA fulfilled its Section 7(a)(1) obligations by terminating the program and if the USDA fulfilled its obligations *after* terminating the program. The Court finds that the USDA did not fulfill its obligations under Section 7(a)(1).

The FWS listed the flycatcher as an endangered species in 1995. AR A6034. Accordingly, the ESA requires that the USDA (and in this case the focus is on APHIS) use its authority to carry out flycatcher conservation programs in consultation with assistance from the FWS. From 1999 to 2010, the USDA authorized the beetle release program and then operated the insectaries, hoping to encourage native plant life and in turn benefit species including the flycatcher. AR A5990-92. After learning the programs could adversely affect the flycatcher or its critical habitat, the USDA sought consultation from FWS. AR A5064, A5628-29.

The USDA and the FWS agencies consulted on whether to terminate the program and its related permits. AR A5986-6121. This consultation included USDA's BA, which detailed actions the USDA pursued in terminating the program and resulted in a finding of an unlikelihood of adverse effect on the flycatcher. <u>Id.</u> The FWS concurred with the finding that the termination of the program may affect but was not likely to adversely affect the flycatcher or its critical habitat. AR A6207.

The USDA first argues that its actions satisfied its obligations under Section 7(a)(1) because the program served, in part, to conserve habitat that endangered species rely upon for survival—including the flycatcher. ECF No. 30.

The USDA correctly characterizes its obligations as a general but affirmative duty to conserve endangered species. ECF No. 30 at 8. It also correctly claims its decisions are entitled

deference. Id. But despite the duty's general and deferential nature, the USDA cannot rely upon its program for fulfilling Section 7(a)(1) obligations *after* terminating the program. Regardless of the program's purpose between 1999 and 2010, the flycatcher remained an endangered species after USDA terminated the program. Accordingly, the USDA had a continuing obligation under Section 7(a)(1) to carry out conservation measures until conservation was no longer necessary. This was especially true given the beetle's negative impact on the flycatcher's habitat. While the USDA is not explicitly obligated under Section 7(a)(1) to directly mitigate damage to the flycatcher habitat arising from its beetle release program, termination of the program certainly did nothing to reverse or end the damage to the flycatcher's habitat inflicted by (and continuing to be inflicted by) the beetles. As a result of the information it received about the failure of its beetle release program, the USDA was clearly aware of the accelerating deterioration of the flycatcher habitat and the increasing urgency of its obligation under Section 7(a)(1) to engage in conservation efforts. Thus, the ESA required (and requires) that the USDA take *some* action in an effort to actually conserve the flycatcher. The USDA cannot rely upon its terminated program to satisfy its Section 7(a)(1) duties.

The USDA's second argument also fails to demonstrate that USDA fulfilled its Section 7(a)(1) obligations. USDA argues it satisfied its obligations by following its long-standing policy to terminate existing permits and discontinue issuing permits that were found to adversely affect endangered animals. ECF No. 30 at 38-39. The USDA's argument is unavailing. While terminating the permitting program would stop the future damage that would be done to the flycatcher's habitat by the release of additional beetles, terminating the issuance of permits, as noted, does nothing to satisfy the USDA's duties under Section 7(a)(1) to take steps or establish programing to *preserve* the flycatcher. In short, the USDA has not adequately demonstrated how its termination policy satisfies its affirmative duty to adopt a "conservation" policy as required under Section 7(a)(1). Simply referencing USDA's own "long-standing" policy regarding terminating the use of biocontrol agents is insufficient. As of the time of the submissions in this case, the USDA has not identified a separate USDA conservation program(s) subsequent to the termination of the beetle release program which serves to conserve the habitat of the flycatcher.

1      Because no further action is alleged or found in the record, USDA has not satisfied its

2      ongoing obligations under 7(a)(1) by simply terminating the beetle program found to adversely

3      affect the flycatcher. The Court therefore grants summary judgment in the Center's favor on this

4      claim.

5

6                          **4.   Claims 4 and 5 Brought under NEPA**

7            The Center brings Claims 4 and 5 under NEPA. NEPA imposes only procedural

8      requirements rather than particular substantive results. <u>Laguna Greenbelt, Inc. v. U.S. Dep't of</u>

9      <u>Transp.</u>, 42 F.3d 517, 523 (9th Cir. 1994). It requires federal agencies take a "hard look" at the

10     environmental consequences of its proposed major actions. <u>Ocean Advocates v. U.S. Army Corps</u>

11     <u>of Eng'rs</u>, 361 F.3d 1108, 1124 (9th Cir. 2004).

12           NEPA also requires agencies complete an Environmental Impact Statement (EIS) for any

13     major federal action that may significantly affect the quality of the human environment. 42 U.S.C.

14     § 433(2)(C). However, an agency may prepare an Environmental Assessment (EA) to determine

15     if its proposed action might significantly affect the quality of the human environment before

16     preparing an EIS. 40 C.F.R. § 1508.9. An EIS is not required if the agency issues a Finding of No

17     Significant Impact (FONSI) in its EA. <u>Dep't of Transp. v. Public Citizen</u>, 541 U.S. 752, 752

18     (2004).

19                          **a.   The USDA did not violate NEPA**

20           The Center argues USDA violated NEPA implementing procedure 7 C.F.R. 372.9(f) by

21     failing to implement mitigation and remedial conditions outlined in the environmental

22     documentation and committed to as part of the decision-making process.

23           USDA responds that the mitigation commitments that it committed to pertained only to

24     APHIS insectary sites. It also argues APHIS only had the authority to make mitigation

25     commitments for its own sites. Finally, it asserts that because it submitted a Finding of No

26     Significance rather than a *mitigated* Finding of No Significance, even if the Finding of No

27     Significance outlined remedial measures, it was not bound to them.

28

**i.    Legal Standard**

Under 7 C.F.R. 372.9(f), APHIS is required to implement mitigation and other conditions

established in environmental documentation and committed to as part of the decision-making

process. 7 C.F.R. 372.9(f). Environmental statements are sufficient without requiring an agency to

actually mitigate adverse environmental impacts or without assurances that third parties will

mitigate against adverse impacts. Tyler v. Cisneros, 136 F.3d 603, 608 (9th Cir. 1998). However,

NEPA mandates that an agency must implement mitigation measures that the agency committed

to in the environmental impact statement as part of the decision for the federal action. Id.

**ii.    Application**

7 C.F.R. § 372.9(f), on its face, governs APHIS' actions—not the USDA entirely. APHIS

made the following statements about mitigation and remedial efforts or responsibilities:

1.   1997 Biological Assessment and Project Proposal:

The proposal states that "[a]ny needed remedial actions such as manual revegetation

[…] will be implemented several years before the expected arrival of biocontrol agents,

if research and monitoring indicate a need." AR A1286. The actions would be taken

before general release. AR A1286. The proposal recommends that the Saltcedar

Consortium be responsible for recommending repression or implementations methods.

Id. APHIS acted as a member of this group but made no specific commitments to carry

out remedial efforts. AR A1292-93. The USDA—acting through its Natural Resources

Conservation Service—was offered as the lead agency for natural revegetation, but the

proposal assigned responsibilities for manual revegetation to the land management

agencies at each individual site. AR A1293-94.

2.   Final EA

APHIS did not commit to any specific or general actions. AR A1534.

3.   Memorandum of Understanding

The memo defined the roles and responsibilities for the joint management of the beetle

program. AR A1737. APHIS did not commit to any remedial duties. Id.

4.   2003 EA and 2004 Monitoring Plan

APHIS agreed to meet with project cooperators and land managers to develop and implement a restoration plan for sites in the 2005 program if monitoring suggested a need. AR A3120. The plan offered generic examples as for mitigation procedures. Id. The plan also committed to immediate site visits to 2005 locations if a real or potential risk to the health of human or non-target species arose. Id. If the reduction or removal of the beetles were warranted, a plan would be developed. Id. APHIS again offered generic examples. Id.

5. 2005 Final BA and EA

APHIS and FWS clarified APHIS committed to revegetation and mitigation plans at the USDA insectary sites if found to be necessary, but landowners and managers were solely responsible for addressing unanticipated impacts at their sites. AR A3995. They emphasized APHIS had no authority or discretion of potential post-release indirect effects otherwise. Id.

APHIS agreed to participate in the interagency group to address flycatcher needs. AR A6040. However, it explicitly dismissed eradication efforts. Id. The FWS supported this decision. AR A3994-99.

In asserting its fourth claim, the Center attempts to point to all mitigation and remedial commitments made throughout the record. However, 7 C.F.R. § 372.9(f) applies only to the commitments made by APHIS specifically. APHIS made no commitments until the 2005 EA and BA. It committed to take remedial actions to the 2005 site locations, which are north of 37N latitude. This commitment does not extend to the sites below the 37N latitude —the sites which may require remedial actions. The Center has not shown APHIS failed to follow through with its commitments under the 2005 program. Accordingly, APHIS has not violated 7 C.F.R. § 372.9(f).

. . .

. . .

. . .

**b.  The USDA Did Not Violate NEPA Supplementation Requirements**

The Center argues that the USDA violated NEPA by terminating the program without supplementing previous NEPA documents. ECF No. 28.  The Center contends that the USDA needed to supplement the NEPA documents after learning the 2005 EA assumptions were erroneous. Id. The USDA responds that it was not required to supplement its NEPA review because no ongoing federal action existed. ECF No. 30.

**i.  Legal Standard**

If an agency initially prepares an EIS, NEPA also requires that the agency supplement the EIS if "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action of its impacts" arise. Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557-58 (9th Cir. 2000).

However, "supplementation is necessary only if there remains major Federal action to occur, as that term is used in [42 U.S.C.] § 4332(2)(C)." Norton v. Southern UT Wilderness Alliance, 542 U.S. 55, 73 (2004) (internal quotation marks omitted). Section 4332(2)(C) requires federal agencies to provide environmental impact statements "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The term "action significantly affecting the quality of the human environment" closely tracks the language used in the regulation permitting the issuance of a FONSI, which is allowed "only if the [EA] supports the finding that the proposed action will not have a significant effect on the human environment." 40 C.F.R. § 6.206(a). Therefore, "[i]f there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 374 (1989). This "permits the public and other government agencies to react to the effects of a proposed action at a meaningful time." Id. at 371.

1              **ii.    Application**

2       The USDA completed an EA that resulted in a FONSI in July of 1999 for its initial

3   program. AR A1525-54. The FWS concurred with this finding. AR A3422. The USDA completed

4   a second EA resulting in a FONSI in June 2005 for the second phase of its program. AR A3914.

5   Again, the FWS concurred. AR A3436, A3486-88.

6       Accordingly, the Court finds that the USDA did not violate its supplementation obligations

7   under NEPA. There are two reasons for this ruling.

8       First, NEPA only requires supplementation of an EIS, not an EA. The USDA never

9   completed an EIS. It instead completed an EA in 1999 and a second EA in 2005, both of which

10  resulted in a FONSI; therefore, an EIS was not required. Because an EIS was not required, no

11  supplementation was required under NEPA. 50 C.F.R. § 1502.9(c)(1)(ii).

12      Second, even if the USDA needed to complete an EIS, the USDA did not need to

13  supplement its NEPA documents because there was no ongoing major federal action. Each EA

14  resulted in a FONSI. These findings represented the USDA's determination that its proposed

15  actions would not have a significant effect on the human environment, meaning there was no

16  ongoing major federal action. Because there was no ongoing major federal action, even if the

17  USDA completed an EIS, NEPA would not require the USDA to supplement its documents.

18  . . .

19  . . .

20  . . .

21

22

23

24

25

26

27

28

## V.    CONCLUSION

For the reasons discussed above,

**IT IS ORDERED** that Plaintiffs Center for Biological Diversity, Maricopa Audubon Society, and Dr. Robin Silver's Motion for Summary Judgment, ECF No. 28, is GRANTED IN PART AND DENIED IN PART. The Clerk of the Court is instructed to enter judgment in favor of the plaintiffs as to Claim Two.

**IT IS FURTHER ORDERED** that Defendants Tom Vilsack, Gregory Parham, Sally Jewell, and Dan Ashe's Cross Motion for Summary Judgment, ECF No. 30, is GRANTED IN PART AND DENIED IN PART. The Clerk of the Court is instructed to enter judgment in favor of the defendants as to Claims One, Three, Four, and Five.

DATED: <u>July 24, 2017</u>.

_____

**RICHARD F. BOULWARE, II**
**United States District Judge**